Mr. Justice Brennan
delivered the opinion of the Court.
Respondent Convertible Top Replacement Co., Inc., (CTR) acquired by assignment from the Automobile Body Research Corporation (AB) all rights for the territory of Massachusetts in United States Patent No. 2,569,724, known as the Maekie-Duluk patent. This is a combination patent covering a top-structure for automobile “convertibles.” Structures embodying the patented combination were included as original equipment in 1952-1954 models of convertibles manufactured by the General Motors Corporation and the Ford Motor Company. They were included in the General Motors cars by authority of a license granted to General Motors by AB; Ford, however, had no license during the 1952-1954 *611 period, and no authority whatever under the patent until July 21, 1955, when it entered into an agreement, discussed later, with AB; Ford’s manufacture and sale of the automobiles in question therefore infringed the patent. Petitioner Aro Manufacturing Co., Inc. (Aro), which is not licensed under the patent, produces fabric components designed as replacements for worn-out fabric portions of convertible tops; unlike the other elements of the top-structure, which ordinarily are usable for the life of the car, the fabric portion normally wears out and requires replacement after about three years of use. Aro’s fabrics are specially tailored for installation in particular models of convertibles, and these have included the 1952-1954 General Motors and Ford models equipped with the Mackie-Duluk top-structures.
CTR brought this action against Aro in 1956 to enjoin the alleged infringement and contributory infringement, and to obtain an accounting, with respect to replacement fabrics made and sold by Aro for use in both the General Motors and the Ford cars embodying the patented structures. The interlocutory judgment entered for CTR by the District Court for the District of Massachusetts, 119 U. S. P. Q. 122, and affirmed by the Court of Appeals for the First Circuit, 270 F. 2d 200, was reversed here. Aro Mfg. Co. v. Convertible Top Replacement Co., 365 U. S. 336 (“Aro I”), petition for rehearing or alternative motion for amendment or clarification denied, 365 U. S. 890. Our decision dealt, however, only with the General Motors and not with the Ford cars. Like the Court of Appeals, we treated CTR’s right to relief as depending wholly upon the question whether replacement of the fabric portions of the convertible tops constituted infringing “reconstruction” or permissible “repair” of the patented combination. The lower courts had held it to constitute “reconstruction,” making the car owner for whom it was performed a direct infringer and Aro, which made *612 and sold the replacement fabric, a contributory infringer; we disagreed and held that it was merely “repair.” The reconstruction-repair distinction is decisive, however, only when the replacement is made in a structure whose original manufacture and sale have been licensed by the patentee, as was true only of the General Motors cars; when the structure is unlicensed, as was true of the Ford cars, the traditional rule is that even repair constitutes infringement. Thus, the District Court had based its ruling for CTR with respect to the Ford cars on the alternative ground that, even if replacement of the fabric portions constituted merely repair, the car owners were still guilty of direct infringement, and Aro of contributory infringement, as to these unlicensed and hence infringing structures. 119 U. S. P. Q. 122, 124. This aspect of the case was not considered or decided by our opinion in Aro I.
On remand, however, another judge in the District Court read our opinion as requiring the dismissal of CTR’s complaint as to the Ford as well as the General Motors cars, and entered judgment accordingly. CTR appealed the dismissal insofar as it applied to the Ford cars, and the Court of Appeals reinstated the judgment in favor of CTR to that extent. 312 F. 2d 52. In our view the Court of Appeals was correct in holding that its “previous decision in this case was not reversed insofar as unlicensed Ford cars are concerned.” 312 F. 2d, at 57.[1] *613 However, we granted certiorari, 372 U. S. 958, to consider that question, and to consider also the issue that had not been decided in Aro I: whether Aro is liable for contributory infringement, under 35 U. S. C. § 271 (c), with respect to its manufacture and sale of replacement fabrics for the Ford cars.[2]
*614 I.[3]
CTR contends, and the Court of Appeals held, that since Ford infringed the patent by making and selling the top-structures without authority from the patentee,[4] persons who purchased the automobiles from Ford likewise infringed by using and repairing the structures; and hence Aro, by supplying replacement fabrics specially designed to be utilized in such infringing repair, was guilty of contributory infringement under 35 U. S. C. § 271 (c). In Aro I, 365 U. S., at 341-342, the Court said:
“It is admitted that petitioners [Aro] know that the purchasers intend to use the fabric for replacement purposes on automobile convertible tops which are covered by the claims of respondent’s combination *615 patent, and such manufacture and sale with that knowledge might well constitute contributory infringement under § 271 (c), if, but only if, such a replacement by the purchaser himself would in itself constitute a direct infringement under § 271 (a), for it is settled that if there is no direct infringement of a patent there can be no contributory infringement. ... It is plain that § 271 (c) — a part of the Patent Code enacted in 1952 — made no change in the fundamental precept that there can be no contributory infringement in the absence of a direct infringement. That section defines contributory infringement in terms of direct infringement — namely the sale of a component of a patented combination or machine for use 'in an infringement of such patent.’ And § 271 (a) of the new Patent Code, which defines 'infringement/ left intact the entire body of case law on direct infringement. The determinative question, therefore, comes down to whether the car owner would infringe the combination patent by replacing the worn-out fabric element of the patented convertible top on his car . . . .”
Similarly here, to determine whether Aro committed contributory infringement, we must first determine whether the car owners, by replacing the worn-out fabric element of the patented top-structures, committed direct infringement. We think it clear, under § 271 (a) of the Patent Code and the ''entire body of case law on direct infringement” which that section ''left intact,” that they did.
Section 271 (a) provides that “whoever without authority makes, uses or sells any patented invention . . . infringes the patent.” It is not controverted— nor could it be — that Ford infringed by making and selling cars embodying the patented top-structures without any authority from the patentee. If Ford had had such authority, its purchasers would not have infringed *616 by using the automobiles, for it is fundamental that sale of a patented article by the patentee or under his authority carries with it an “implied license to use.” Adams v. Burke, 17 Wall. 453, 456; United States v. Univis Lens Co., 316 U. S. 241, 249, 250-251. But with Ford lacking authority to make and sell, it could by its sale of the cars confer on the purchasers no implied license to use, and their use. of the patented structures was thus “without authority” and infringing under §271 (a).[5] Not only does that provision explicitly regard an unauthorized user of a patented invention as an infringer, but it has often and clearly been held that unauthorized use, without more, constitutes infringement. Birdsell v. Shaliol, 112 U. S. 485; Union Tool Co. v. Wilson, 259 U. S. 107, 114; see Sanitary Refrigerator Co. v. Winters, 280 U. S. 30, 32-33; General Talking Pictures Corp. v. Western Electric Co., 305 U. S. 124, 127.
If the owner’s use infringed, so also did his repair of the top-structure, as by replacing the worn-out fabric component. Where use infringes, repair does also, for it perpetuates the infringing use.
“No doubt ... a patented article may be repaired without making the repairer an infringer, . . . but not where it is done for one who is. It is only where the device in patented form has come lawfully into the hands of the person for or by whom it is repaired that this is the case. In other words, if one without right constructs or disposes of an infringing machine, it affords no protection to another to have merely repaired it; the repairer, by supplying an essential part of the patented combination, contributing by *617 so much to the perpetuation of the infringement.” Union Special Mach. Co. v. Maimin, 161 F. 748, 750 (C. C. E. D. Pa. 1908), aff’d, 165 F. 440 (C. A. 3d Cir. 1908).
Accord, Remington Rand Business Serv., Inc., v. Acme Card System Co., 71 F. 2d 628, 630 (C. A. 4th Cir. 1934), cert. denied, 293 U. S. 622; 2 Walker, Patents (Deller ed. 1937), at 1487. Consequently replacement of worn-out fabric components with fabrics sold by Aro, held in Aro I to constitute “repair” rather than “reconstruction” and thus to be permissible in the case of licensed General Motors cars, was not permissible here in the case of unlicensed Ford cars. Here, as was not the case in Aro I, the direct infringement by the car owners that is prerequisite to contributory infringement by Aro was unquestionably established.
We turn next to the question whether Aro, as supplier of replacement fabrics for use in the infringing repair by the Ford car owners, was a contributory infringer under § 271 (c) of the Patent Code. That section provides:
“Whoever sells a component of a patented machine, manufacture, combination or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use, shall be liable as a contributory infringer.”
We think Aro was indeed liable under this provision.
Such a result would plainly have obtained under the contributory-infringement case law that § 271 (e) was intended to codify.[6] Indeed, most of the law was estab *618 lished in cases where, as here, suit was brought to hold liable for contributory infringement a supplier of replacement parts specially designed for use in the repair of infringing articles. In Union Tool Co. v. Wilson, supra, 259 U. S., at 113-114, the Court held that where use of the patented machines themselves was not authorized,
“There was, consequently, no implied license to use the spare parts in these machines. As such use, unless licensed, clearly constituted an infringement, the sale of the spare parts to be so used violated the injunction [enjoining infringement].”
As early as 1897, Circuit Judge Taft, as he then was, thought it “well settled” that
“where one makes and sells one element of a combination covered by a patent with the intention and *619 for the purpose of bringing about its use in such a combination he is guilty of contributory infringement and is equally liable to the patentee with him who in fact organizes the complete combination.” Thomson-Houston Elec. Co. v. Ohio Brass Co., 80 F. 712, 721 (C. A. 6th Cir. 1897).
While conceding that in the case of a machine purchased from the patentee, one “may knowingly assist in assembling, repairing, and renewing a patented combination by furnishing some of the needed parts,” Judge Taft added: “but, when he does so, he must ascertain, if he would escape liability for infringement, that the one buying and using them for this purpose has a license, express or implied, to do so.” Id., at 723. See also National Brake & Elec. Co. v. Christensen, 38 F. 2d 721, 723 (C. A. 7th Cir. 1930), cert. denied, 282 U. S. 864; Reed Boiler Bit Co. v. Hughes Tool Co., 12 F. 2d 207, 211 (C. A. 5th Cir. 1926); Shickle, Harrison & Howard Iron Co. v. St. Louis Car-Coupler Co., 77 F. 739, 743 (C. A. 8th Cir. 1896), cert. denied, 166 U. S. 720. These cases are all authority for the proposition that “The right of one, other than the patentee, furnishing repair parts of a patented combination, can be no greater than that of the user, and he is bound to see that no other use of such parts is made than that authorized by the user’s license.” National Malleable Casting Co. v. American Steel Foundries, 182 F. 626, 641 (C. C. D. N. J. 1910).
In enacting § 271 (c), Congress clearly succeeded in its objective of codifying this case law. The language of the section fits perfectly Aro’s activity of selling “a component of a patented . . . combination . . . , constituting a material part of the invention, . . . especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use.” Indeed, this is the almost unique case in which the component was *620 hardly suitable for any noninfringing use.[7] On this basis both the District Court originally, 119 U. S. P. Q., at 124, and the Court of Appeals in the instant case, 312 F. 2d, at 57, held that Aro was a contributory infringer within the precise letter of § 271 (c). See also Aro I, 365 U. S., at 341.
However, the language of § 271 (c) presents a question, apparently not noticed by the parties or the courts below, concerning the element of knowledge that must be brought home to Aro before liability can be imposed. It is only sale of a component of a patented combination “knowing the same to be especially made or especially adapted for use in an infringement of such patent” that is contributory infringement under the statute. Was Aro “knowing” within the statutory meaning because — as it admits, and as the lower courts found — it knew that its replacement fabrics were especially designed for use in the 1952-1954 Ford convertible tops and were not suitable for other use? Or does the statute require a further showing that Aro knew that the tops were patented, and knew also that Ford was not licensed under the patent so that any fabric replacement by a Ford car owner constituted infringement?
On this question a majority of the Court is of the view that § 271 (c) does require a showing that the alleged contributory infringer knew that the combination for which his component was especially designed was both patented and infringing.[8] With respect to many of the *621 replacement-fabric sales involved in this case, Aro clearly-had such knowledge. For by letter dated January 2, 1954, AB informed Aro that it held the Mackie-Duluk patent; that it had granted a license under the patent to General Motors but'to no one else; and that “It is obvious, *622 from the foregoing and from an inspection of the convertible automobile sold by the Ford Motor Company, that anyone selling ready-made replacement fabrips for these automobiles would be guilty of contributory infringement of said patents.” Thus the Court’s interpretation of the knowledge requirement affords Aro no defense with respect to replacement-fabric sales made after January 2, 1954. It would appear that the over *623 whelming majority of the sales were in fact made after that date, since the oldest of the cars were 1952 models and since the average life of a fabric top is said to be three years. With respect to any sales that were made before that date, however, Aro cannot be held liable in the absence of a showing that at that time it had already acquired the requisite knowledge that the Ford car tops were patented and infringing. When the case is remanded, a finding of fact must be made on this question by the District Court, and, unless Aro is found to have had such prior knowledge, the judgment imposing liability must be vacated as to any sales made before January 2, 1954. As to subsequent sales, however, we hold, in agreement with the lower courts, that Aro is liable for contributory infringement within the terms of § 271 (c).
In seeking to avoid such liability, Aro relies on the Mercoid cases. Mercoid Corp. v. Mid-Continent Investment Co., 320 U. S. 661; Mercoid Corp. v. Minneapolis-Honeywell Regulator Co., 320 U. S. 680. Since those cases involved essentially an application of the doctrine of patent misuse, which is not an issue in this case,[9] they are not *624 squarely applicable to the contributory infringement question here. On the other hand, they are hardly irrelevant. The Court in Mercoid said, among other things, that the principle that “he who sells an u'npatented part of a combination patent for use in the assembled machine may be guilty of contributory infringement” could no longer prevail “against the defense that a combination patent is being used to protect an unpatented part from competition.” 320 U. S., at 668. As the Court recognized, its definition of misuse was such as “to limit substantially the doctrine of contributory infringement” and to raise a question as to “what residuum may be left.” 320 IT. S., at 669. See Report of the Attorney General’s National Committee to Study the Antitrust Laws (1955), at 252. The answer to Aro’s argument is that Congress enacted § 271 for the express purpose of reinstating the doctrine of contributory infringement as it had been developed by decisions prior to Mercoid, and of overruling any blanket invalidation of the doctrine that could be found in the Mercoid opinions. See, e. g., 35 U. S. C. §§271 (c), (d); Hearings, supra, n. 6, at 159, 161-162; and the Aro I opinions of Mr. Justice Black, 365 U. S., at 348-349 and nn. 3-4; Mr. Justice Harlan, id., at 378, n. 6; and Mr. Justice Brennan, id., at 365-367. Hence, where Aro’s sale of replacement fabrics for unlicensed Ford cars falls squarely within § 271 (c), and where Aro has not properly invoked the misuse doctrine as to any other conduct by CTR or AB, Mercoid cannot successfully be employed to shield Aro from liability for contributory infringement.[10]
Thus we hold that, subject to the reservation expressed at pp. 488-491, supra, with respect to sales made before January 2, 1954, and subject to the further reser *625 vations set forth in succeeding Parts of this opinion, Aro’s -sales of replacement fabrics for use in the Ford cars constituted contributory infringement under § 271 (c).
II.[11]
Although we thus agree with the Court of Appeals that Aro was liable for contributory infringement with respect to the Ford cars, we find merit in a defense asserted by Aro. In our view this defense negatives Aro’s liability as to some of the replacement fabrics in question and, as to the others, reduces substantially — quite possibly to a mere nominal sum — the amount of recovery that CTR may be awarded. The defense is based on the agreement of July 21, 1955, between Ford and AB. See note 4, supra. This agreement affected Aro’s liability differently, we think, depending upon whether the replacement-fabric sales were made before or after the agreement date. We shall first discuss its effect on liability for the subsequent sales.
The agreement was made at a time when, as CTR states in its brief, “Ford had already completed its manufacture of all the cars here involved.” Under it, Ford agreed to pay AB $73,000 for certain rights under the patent, which were defined by paragraph 1 of the agreement as follows:
“1. AB hereby releases Ford, its associated companies . . . [and] its and their dealers, customers and users of its and their products, of all claims that AB has or may have against it or them for infringement of said patents arising out of the manufacture, use or sale of devices disclosed therein and manufactured before December 31, 1955, other than the ‘replacement top fabrics’ licensed under paragraph 3.”
*626 In paragraph 3, AB licensed Ford to make and sell “replacement top fabrics” for the Mackie-Duluk top-structures, receiving in return a royalty — separate from the $73,000 lump-sum payment — of 5% of the net sales. And in paragraph 5, AB expressly reserved the right
“to license under . . . said Mackie-Duluk patent . . . the manufacture, use and sale of replacement top fabrics other than those supplied to, made by or sold by Ford ... to the extent that AB is entitled to reserve such right under 35 United States Code, §271 (1952).”
In a pretrial memorandum filed early in the lawsuit, the District Court construed the agreement in the following manner, which we think to be a correct interpretation of the parties’ intention:
(1) With respect to all patented top-structures manufactured before July 21, 1955, and all replacement fabrics installed before that date, it was a “release” to the parties named — that is, Ford and its customers — of the claims for infringement by manufacture, sale, or use of the patented combination;
(2) With respect to any new structures manufactured between July 21 and December 31, 1955 (it-appears that there were no such structures), the agreement was a “future license” to Ford and its customers to make, sell, and use the patented combination, but “excepting replacements” unless these were provided by Ford under the special license granted by paragraph 3;
(3) With respect to the post-July 21 status of structures manufactured before July 21, the agreement was also a “future license” to Ford and its customers of the rights to make, sell, and use, but again, “excepting replacements” not provided by Ford; and
(4) The agreement “demonstrated an intention not to release” or license any persons other than Ford or its customers; in particular, the parties did not intend *627 to release or license contributory infringers like Aro in respect of replacement fabrics sold either before or after July 21.
Considering the legal effect of the agreement as so construed, the District Court went on to rule that if the fabric replacement should be held to constitute repair rather than reconstruction (as this Court did subsequently hold in Aro I), then:
(a) Aro would be liable for contributory infringement as to replacements made before July 21, 1955, since “I do not construe the agreement to release contributory infringers for rights of action already accrued”;
(b) however, despite the intention of the parties, Aro would not be liable as to replacements made after July 21, 1955, since “If replacement is legitimate repair, no average owner can do-it-yourself, and he must be free to go to persons in the position of defendants without apprehension on their part.”
The distinction between pre-agreement and post-agreement sales subsequently became irrelevant to the District Court’s view of the case, when it held after trial that replacement of the fabrics constituted reconstruction rather than repair; the Court’s interlocutory judgment for CTR thus held Aro liable with respect to all the Ford cars in question. When this Court in Aro I reversed the ruling on the reconstruction-repair issue, the only reference in the opinions to the Ford cars took the view that Aro should be held liable only in respect of replacements made on those cars “before July 21, 1955,” 365 U. S., at 368 (concurring opinion), and thus agreed with the distinction originally drawn by the District Court. The present opinion of the Court of Appeals, however, in reinstating the Ford car portion of the interlocutory judgment for CTR without consideration of this distinction, appears to have held Aro liable in respect of replacement fabrics sold for the 1952-1954 Ford cars not only before *628 July 21,1955, but also after that date and — so long as the cars remain'on the road — up to the present and into the future.
CTR’s argument in support of this result emphasizes that the agreement in terms ran in favor only of Ford and Ford’s customers and not of third parties like Aro, and that it expressly excepted “replacement top fabrics” from the scope of the rights it granted. Reliance is also placed on testimony that the amount to be paid by Ford under the agreement was set as low as $73,000 only because of a clear understanding between the parties that such payment would not affect AB’s rights to recover from persons in the position of Aro.[12] CTR thus argues:
“If the Ford agreement had never been made at all, it is clear that it would have been proper to require that Aro pay royalties, insofar as infringing Ford cars are concerned, even up to the present time. This being the case, it is clear that it was proper for the agreement to expressly recognize and to expressly exclude Aro’s liability from its terms. Since Ford refused to purchase any rights for Aro, either before or after July 21, 1955, Aro is liable for its Ford repair activities both before and after that date.”
Insofar as replacement fabrics sold “after that date” are concerned, we do not agree. We think the agreement’s attempt to reserve rights in connection with future sales of replacement fabrics was invalid. By the agree- *629 xnent AB authorized the Ford car owners, in return for a payment from Ford, to use the patented top-structures from and after July 21,1955. Since they were authorized to use the structures, they were authorized to repair them so as “to preserve [their] fitness for use ....’’ Aro I, 365 U. S., at 345, quoting Leeds & Catlin Co. v. Victor Talking Machine Co., 213 U. S. 325, 336. The contrary provisions in the agreement, purporting to restrict the right of use and repair by prohibiting fabric replacement unless done with fabrics purchased from Ford or some other licensee, stand condemned by a long line of this Court's decisions delimiting the scope of the patent grant. When the patentee has sold the patented article or authorized its sale and has thus granted to the purchaser an “implied license to use,” it is clear that he cannot thereafter restrict that use; “so far as the use of it was concerned, the patentee had received his consideration, and it was no longer within the monopoly of the patent.” Adams v. Burke, 17 Wall. 453, 456. In particular, he cannot impose conditions concerning the unpatented supplies, ancillary materials, or components with which the use is to be effected. E. g., Carbice Corp. v. American Patents Development Corp., 283 U. S. 27; Mercoid Corp. v. Mid-Continent Investment Co., 320 U. S. 661; United States v. Loews, Inc., 371 U. S. 38, 46. It follows that here, where the patentee has by the Ford agreement explicitly authorized the purchasers to use the articles, the patentee cannot thereafter restrict that use by imposing a condition that replacement parts may be purchased only from a licensed supplier.
With the restriction thus eliminated from consideration, it is clear that Aro cannot be liable for contributory infringement in connection with sales of replacement fabrics made after July 21, 1955. After that date the Ford car owners had authority from the patentee — indeed, had *630 a “license” [13] — fully to use and repair the patented structures. Hence they did not commit direct infringement under § 271 (a) when they had the fabrics replaced; hence Aro, in selling replacement fabrics for this purpose, did not commit contributory infringement under § 271 (c). The case as to the post-agreement sales is thus squarely ruled by Aro I. It was held there, despite AB’s attempt to reserve the right to license sales of replacement fabrics, that General Motors car owners, who were authorized to use the patented structures by virtue of the license granted General Motors by AB, performed nothing more than “permissible repair” when they replaced the worn-out fabrics, and hence that there was no direct infringement by the owners to which Aro, by selling the replacement fabrics, could contribute. In other words, since fabric replacement was “repair” rather than “reconstruction,” it was merely an aspect of the use of the patented article, and was thus beyond the patentee’s power to control after the use itself had been authorized. So here, the Ford car owners were authorized to use the patented structures after July 21,1955, by virtue of the agreement between AB and Ford. Hence they were likewise entitled, despite AB’s attempt to reserve this right, to perform the “permissible repair” of replacing the worn-out fabrics; hence, just as in Aro I, the car owners by replacing the fabrics committed no direct infringement to which Aro’s sales could contribute. “[I]f the purchaser and user could not be amerced as an infringer .certainly one *631 who sold to him . . . cannot be amerced for contributing to a non-existent infringement.” Aro I, 365 U. S., at 341.
CTR would have it that this result is inconsistent with Birdsell v. Shaliol, 112 U. S. 485, and Union Tool Co. v. Wilson, 259 U. S. 107. In our view it is .not. Birdsell allowed the patentee to hold one infringer liable for use of the patented machines after obtaining a judgment against another infringer for the manufacture and sale of the same machines; Union Tool held infringement to exist where the defendant, after being held liable for the manufacture and sale of certain infringing machines, sold spare parts for use in the same machines. Both cases turned upon the fact that the patentee had not collected on the prior judgment and thus had not received any compensation for the infringing use — or, indeed, any compensation at all.[14] Here, in contrast, the amount paid by Ford under the agreement was expressly stated to include compensation for the use of the patented structures by Ford’s purchasers; moreover, the agreement covered future use and in this respect operated precisely like a license, with the result that after the agreement date there was simply no infringing use for which the patentee was entitled to compensation. See Birdsell v. Shaliol, supra, 112 U. S., at 487. In sum, AB obtained its reward for the use of the patented structures under the terms of the agreement with Ford; CTR cannot obtain from Aro here another reward for the same use.
*632 We therefore hold, in agreement with the District Court’s original view, that Aro is not liable for replacement-fabric sales[15] made after July 21, 1955. Insofar as the judgment of the Court of Appeals imposes liability for such sales, it is reversed.[16]
III.[17]
Turning to the question of replacement-fabric sales made before July 21, 1955, we agree with the District Court that the agreement between AB and Ford did not negative Aro’s liability for these sales. With respect to the post-agreement sales the agreement necessarily absolved Aro of liability, its intention to the contrary notwithstanding, because it had the effect of precluding any direct infringement to which Aro could contribute. With respect to the pre-agreement sales, however, Aro’s contributory infringement had already taken place at the time of the agreement. Whatever the agreement’s effect on the amount recoverable from Aro — a matter to be discussed in Part IV of this opinion — it cannot be held, in the teeth of its contrary language and intention, to have erased the extant infringement.
It is true that a contributory infringer is a species of joint-tortfeasor, who is held liable because he has contributed with another to the causing of a single harm to the plaintiff. See Wallace v. Holmes, 29 Fed. Cas. 74, 80 (No. 17,100) (C. C. D. Conn.1871); Thomson-Houston Elec. Co. v. Ohio Brass Co., supra, 80 F., at 721; Rich, *633 21 Geo. Wash. L. Rev. 521, 525 (1953). It is also true that under the old common-law rule, a release given to one joint-tortfeasor necessarily released another, even though it expressly stated that it would have no such effect. See Prosser, Torts (2d ed. 1955), at 243-244. Under this rule Aro’s argument on this point would prevail, since the agreement did release Ford’s purchasers for their infringing use of the top-structures before the agreement date, and that was the use to which Aro contributed. See Schiff v. Hammond Clock Co., 69 F. 2d 742, 746 (C. A. 7th Cir. 1934), reversed for dismissal as moot, 293 U. S. 529. But the rule is not applicable. Even in the area of nonpatent torts, it has been repudiated by statute or decision in many if not most States, see Prosser, supra, at 245, and by the overwhelming weight of scholarly authority. E. g., American Law Institute, Restatement of Torts (1939), § 885 (1) and Comments b-d. And application of the rule to contributory infringement has been rejected by this Court. In Birdsell v. Shaliol, supra, 112 U. S., at 489, the Court applied to a patent case the proposition that “By our law, judgment against one joint trespasser, without full satisfaction, is no bar to a suit against another for the same trespass.” What is true of a judgment is true of a release. See Prosser, supra, at 241-244. A release given a direct infringer in respect of past infringement, which clearly intends to save the releasor’s rights against a past contributory infringer, does not automatically surrender those rights. Thus the District Court was correct in denying that “defendants are entitled to the fortuitous benefit of the old joint tort-feasor rule.” The mere fact that the agreement released Ford and Ford’s customers for their past infringement does not negate Aro’s liability for its past infringement. Hence the judgment of the Court of Appeals, insofar as it relates to Ford car replacement-fabric sales made by Aro before July 21, 1955 — and subject to *634 the reservation set forth at pp. 488-491, supra, with respect to sales made before January 2, 1954 — is affirmed; accordingly, the case is remanded to the District Court for a determination of damages and for such other proceedings as that court deems appropriate.
IV.[18]
The case must now be remanded for a determination of the damages to be recovered from Aro in respect of the infringing pre-agreement sales. It is true that the lower courts have not yet expressly addressed themselves to the damages issue, and that the parties have not argued it here. Nevertheless, it appears that all concerned in this litigation have shared a specific assumption as to the measure of damages that would be available to CTR if it succeeded in establishing infringement. Because we sharply disagree with that assumption, and because expression of our views may obviate the need upon remand for lengthy proceedings before a master in this already over-long litigation, we deem it in the interest of efficient judicial administration to express those views at this time. In brief, it is our opinion that the Ford agreement, while it does not negate Aro’s liability for the prior sales as it does for the subsequent ones, does have the effect of limiting the amount that CTR can recover for the pre-agreement infringement, and probably of precluding recovery of anything more than nominal damages.
If the sum paid by Ford for the release of it and its customers constituted full satisfaction to AB for the infringing use of the patented structures, we think it clear that CTR cannot now collect further payment from Aro *635 for contributing to the same infringing use. The rule is that
“Payments made by one tortfeasor on account of a harm for which he and another are each liable, diminish the amount of the claim against the other whether or not it was so agreed at the time of payment and whether the payment was made before or after judgment . . . Restatement of Torts, supra, §885 (3).
It has been said that “all courts are agreed” upon such a rule. Prosser, supra, at 246. And its applicability to contributory-infringement cases has been clearly indicated by this Court. Birdsell v. Shaliol, supra, 112 U. S., at 488-489; see Hazeltine Corp. v. Atwater Kent Mfg. Co., 34 F. 2d 50, 52 (D. C. E. D. Pa. 1929). Indeed, if “actual damages” or “full compensation” paid by a maker-and-seller can have the effect of releasing a user, as was indicated in Birdsell, such a result should follow a fortiori where, as here, the damages paid were expressly stated to be compensation for use of the device, and the person subsequently sued is a contributory infringer liable merely for contributing to the same infringing use. In such a case full payment by or on behalf of the direct infringer leaves nothing to be collected from the contributory infringer. We therefore find it necessary to consider whether the payment by Ford to AB constituted full payment for the infringing use committed directly by Ford’s purchasers and contributorily by Aro.
This depends upon the measure and total amount of recovery to which CTR and AB are entitled. In particular, if they are entitled to recover a royalty from Aro on the infringing sales of replacement fabrics, it is clear that no such recovery was included in the payment from Ford, whose representatives “weren’t interested in buying any sort of a release or license or anything else that *636 would help out these replacement top people.” See note 12, supra. CTR does contend, and all involved in this litigation have apparently assumed, that a judgment holding Aro liable for contributory infringement will result in recovery of such a royalty on Aro’s sales.[19] This is the assumption with which we disagree. It is our view that despite our affirmance of the judgment against Aro as to sales made before the agreement date, no such royalty will be available to CTR as part of its recovery. We are, indeed, doubtful that CTR can properly be allowed recovery of anything more than nominal damages from Aro.
The measure of recovery for patent infringement is governed by 35 U. S. C. § 284, which provides:
“Upon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court.
“When the damages are not found by a jury, the court shall assess them. In either event the court may increase the damages up to three times the amount found or assessed.”
It is presumably the language “in no event less than a reasonable royalty” that has led to the assumption noted *637 above. But that assumption ignores the fact — clear from the language, the legislative history, and the prior law — that the statute allows the award of a reasonable royalty, or of any other recovery, only if such amount constitutes “damages” for the infringement. It also ignores the important distinction between “damages” and “profits,” and the relevance of this distinction to the 1946 amendment of the statute.
“In patent nomenclature what the infringer makes is 'profits’; what the owner of the patent loses by such infringement is 'damages.’ ” Duplate Corp. v. Triplex Safety Glass Co., 298 U. S. 448, 451. Profits and damages have traditionally been all-inclusive as the two basic elements of recovery. Prior to 1946, the statutory precursor of the present § 284 allowed recovery of both amounts, reading as follows:
“[U]pcm a decree being rendered in any such case for an infringement the complainant shall be entitled to recover, in addition to the profits to be accounted for by the defendant, the damages the complainant has sustained thereby . . . .” R. S. § 4921, as amended, 42 Stat. 392.
By the 1946 amendment, Act of August 1,1946, c. 726, § 1, 60 Stat. 778, 35 U. S. C. (1946 ed.), §§ 67, 70, the statute was changed to approximately its present form, whereby only “damages” are recoverable.[20] The purpose of the change was precisely to eliminate the recovery of profits as such and allow recovery of damages only.
“The object of the bill is to make the basis of recovery in patent-infringement suits general damages, that is, any damages the complainant can *638 prove, not less than a reasonable royalty, together with interest from the time infringement occurred, rather than profits and damages.” H. R. Rep. No. 1587, 79th Cong., 2d Sess. (1946), to accompany H. R. 5311, at 1-2; S. Rep. No. 1503, 79th Cong., 2d Sess. (1946), to accompany H. R. 5311, at 2.[21]
There can be no doubt that the amendment succeeded in effectuating this purpose; it is clear that under the present statute only damages are recoverable. See, e. g., Ric-Wil Co. v. E. B. Kaiser Co., 179 F. 2d 401, 407 (C. A. 7th Cir. 1950), cert. denied, 339 U. S. 958; Livesay Window Co. v. Livesay Industries, Inc., 251 F. 2d 469, 471-472 (C. A. 5th Cir. 1958); Laskowitz v. Marie Designer, Inc., 119 F. Supp. 541, 554-555 (D. C. S. D. Cal. 1954); Cullen, 28 J. Pat. Off. Soc. 838 (1946); Wolff, 28 J. Pat. Off. Soc. 877 (1946).
The 1946 amendment is of crucial significance to the total amount of CTR’s recovery against Aro and hence to the amount, if any, that may still be recovered after receipt of the payment from Ford. When recovery of the infringer’s profits as such was allowed, the rule was that “complainant’s damages are no criterion of defendant’s profits”; it was “immaterial that the profits made by the defendant would not have been made by the plaintiff.” 3 Walker, Patents (Deller ed. 1937), § 845, at 2186. And in cases of joint infringement this Court was said to have declared the doctrine that, whereas “when the total damage sustained has been paid by one tort-feasor, the damages cannot be duplicated through a recovery against another,” nevertheless, “every infringer of a patent right may be made to give up whatever profits he has derived from the infringement, and . . . one in- *639 fringer is not relieved by payment by another infringer, but each is accountable for the profits which he has received.” Hazeltine Corp. v. Atwater Kent Mfg. Co., supra, 34 F. 2d 50, 52. Under such a rule, CTR might well argue that the payment received from Ford could have no effect in preventing it from recovering the profits made by Aro — which might even exceed the amount of a royalty on Aro’s sales.
But the present statutory rule is that only “damages” may be recovered. These have been defined by this Court as “compensation for the pecuniary loss he [the patentee] has suffered from the infringement, without regard to the question whether the defendant has gained or lost by his unlawful acts.” Coupe v. Royer, 155 U. S. 565, 582. They have been said to constitute “the difference between his pecuniary condition after the infringement, and what his condition would have been if the infringement had not occurred.” Yale Lock Mfg. Co. v. Sargent, 117 U. S. 536, 552. The question to be asked in determining damages is “how much had the Patent Holder and Licensee suffered by the infringement. And that question [is] primarily: had the Infringer not infringed, what would Patent Holder-Licensee have made?” Livesay Window Co. v. Livesay Industries, Inc., supra, 251 F. 2d, at 471.
Thus, to determine the damages that may be recovered from Aro here, we must ask how much CTR suffered by Aro’s infringement — how much it would have made if Aro had not infringed. Asking that question, we may assume first that the agreement of July 21, 1955, did not exist and that AB had not collected a cent from Ford. Even on that assumption, we would find it difficult to see why CTR’s damages should be measured by a royalty on Aro’s sales. CTR and AB were not deprived of such a royalty by Aro’s infringement, for they could not have licensed Aro’s sales in any event; they *640 were denied the right to do so in Aro I, and would still be denied it even if they had received no royalties on the patented combinations themselves. For the right could not be granted without allowing the patentee to “derive its profit, not from the invention on which the law gives it a monopoly but from the unpatented supplies with which it is used . . . .” Motion Picture Patents Co. v. Universal Film Mfg. Co., 243 U. S. 502, 517; Mercoid Corp. v. Mid-Continent Investment Co., supra, 320 U. S., at 666-667. It would be absurd to say that what CTR could not recover from Aro in Aro I after it had licensed General Motors, it could recover here if it had stood by and let Ford infringe — as it apparently did, see p. 511, infra— and had then brought suit against Aro before settling with Ford. The rules prohibiting extension of the patent monopoly to unpatented elements are not so readily circumvented. This does not mean, of course, that CTR would have no remedy for Aro’s contributory infringement. It could in a proper case obtain an injunction; it could recover such damages as had actually been suffered from the contributory infringement by virtue of the prolongation of the use of the infringing automobiles; it could in a case of willful or bad-faith infringement recover punitive or “increased” damages under the statute’s trebling provision; and it could perhaps — we express no view on the question — recover from Aro a royalty on Ford’s sales of the patented top-structures, even though such damages were primarily caused not by Aro’s infringement but by Ford’s, in a case where they could not be recovered from Ford or Ford’s customers. It is difficult to conceive of any instance, however, in which actual damages could properly be based on a royalty on sales of an unpatented article used merely to repair the patented structure.
If CTR thus could not collect a royalty on Aro’s sales in the absence of any payment from Ford, it surely can *641 not do so here after AB, in return for $73,000, has released Ford and Ford’s customers from liability for the direct infringement to which Aro contributed. -Are there indeed any actual damages that CTR can recover from Aro after receiving $73,000 from Ford? The answer depends on whether CTR and AB suffered any loss by Aro’s' infringement — -which depends in turn on how much they would have made if Aro had not infringed. But in view of the merely contributory nature of Aro’s infringement, this leads in turn to the question how much CTR and AB would have made if Ford had not infringed; for in that event — -as was held in Aro I with respect to the General Motors cars, and as we have held in Part II, supra, with respect to the post-agreement Ford car sales— Aro could not have contributorily infringed. If Ford had not infringed, AB would have made a royalty on Ford’s sales of the patented top-structures- — -as it made such a royalty under its license to General Motors in Aro I. The amount that would thus have been received must be compared, however, with the amount that AB in fact received from Ford. We shall assume for the present — although CTR will have an opportunity to disprove the assumption upon remand — that the amount received by AB under the agreement was the same amount it would have received had it licensed Ford in the first place to produce the same number of convertible tops.[22] On this assumption, AB is just as well off now as it would have been if Ford had never infringed the patent. And since if Ford *642 had not infringed, Aro could not have contributorily infringed, it follows that what CTR and AB would have made if Aro had not infringed was precisely what they did make by virtue of the Ford agreement. Their pecuniary position was not rendered one cent worse by the total infringement to which Aro contributed, and hence they are not entitled — on the assumption stated above as to the payment by Ford — to anything more than nominal damages from Aro.
To allow recovery of a royalty on Aro’s sales after receipt of the equivalent of a royalty on Ford’s sales, or to allow any recovery from Aro after receipt of full satisfaction from Ford, would not only disregard the statutory provision for recovery of “damages” only, but would be at war with virtually every policy consideration in this area of the law. It would enable the patentee to derive a profit not merely on unpatented rather than patented goods — an achievement proscribed by the Motion Picture Patents and Mercoid cases, supra — but on unpatented and patented goods. In thus doubling the number of rewards to which a patentee is entitled “under our patent law as written,” see Mr. Justice Black concurring in Aro I, 365 U. S., at 360, it would seriously restrict the purchaser’s long-established right to use and repair an article which he has legally purchased and for the- use of which the patentee has been compensated. See Adams v. Burke, 17 Wall. 453. The patentee could achieve this result, moreover, by the simple tactic of not licensing or suing the manufacturer in the first place, but rather standing by while the direct infringement occurs, thus allowing contributory infringements to spring up around him, with the result of bringing within the reach of his monopoly unpatented items that would never have been there if the manufacturer had been licensed from the start. And little is sacrificed, for it is almost always possible to sue or settle with the manufacturer at a later date. This *643 in fact seems to have been the strategy that AB employed here. It first sent Ford a notice of infringement — according to the deposition testimony of AB’s own counsel — in late 1953, “a day or so after we got the patent.” Yet it did nothing to stop Ford’s infringement, and did not settle with Ford until 18 months later, by which time all the automobiles in question had been manufactured. In view of the apparently deliberate delay and of the unquestionably solvent status of the infringer, it indeed seems unlikely that the amount paid for the release was less than would have been paid under a license. In any event, the notion is intolerable that by such delay CTR and AB could entitle themselves to collect from Aro what they could not have collected had Ford been licensed from the start as General Motors was.
To achieve such a result through use of the contributory infringement doctrine would be especially ironic, in view of the purpose of that doctrine as set forth in case law and commentary and as presented to the Congress in urging passage of § 271 (c). That purpose is essentially, as was stated in the earlier versions of the bill that became § 271 (c), “to provide for the protection of patent rights where enforcement against direct infringers is impracticable,” H. R. 5988, 80th Cong., 2d Sess.; H. R. 3866, 81st Cong., 1st Sess. At the hearings on § 271 (c) itself, Mr. Rich, see. n. 6, supra-, explained to the subcommittee that “There may be twenty or thirty percent of all the patents that are granted that cannot practically be enforced against direct infringers .. ..” Hearings, supra, n. 6, at 160.[23] Such a purpose might have been applicable here if CTR and AB had been unable to en *644 force the patent against Ford (a rather unlikely event), since it would indeed have been impractical to sue every one of the car owners. But where the patentee has in fact enforced the patent against so solvent and accessible a direct infringer as Ford, it is difficult to see why it should then be allowed to invoke the contributory infringement doctrine — designed for cases “where enforcement against direct infringers is impracticable” — so as to enforce the patent a second time and obtain a reward that it could not extract from a direct infringer alone. Whatever the result might have been under the old “damages and profits” provision, no such perversion of the congressional purpose is possible within the rule allowing recovery of “damages” only.
Hence we think that after a patentee has collected from or on behalf of a direct infringer damages sufficient to put him in the position he would have occupied had there been no infringement, he cannot thereafter collect actual damages from a person liable only for contributing to the same infringement. This principle is but an application of the rule that full satisfaction received from one tort-feasor prevents further recovery against another. It is consistent with the Court’s opinion in Birdsell v. Shaliol, supra, 112 U. S., at 488-489. See also George Haiss Mfg. Co. v. Link-Belt Co., 63 F. 2d 479, 481 (C. A. 3d Cir. 1932); Buerk v. Imhaeuser, note 14, supra, 4 Fed. Cas. 597. And it is squarely in accord with a recent decision of the Court of Appeals for the Second Circuit. Farrand Optical Co., Inc., v. United States, 325 F. 2d 328, 335 (C. A. 2d Cir. 1963). Nor is there any authority, even in lower courts, directly to the contrary. Of the many cases cited by CTR for the correct proposition that use or repair of an infringing structure constitutes infringement, relatively few deal at all with the question of amount of recovery. Some of these, it is true, do allow recovery on sales of infringing machines and a further *645 recovery on sales of spare parts for those machines. But they are all distinguishable; either the parts themselves were patented,[24] or the infringing parts-supplier had sold the machines as well and thus had arguably taken the sales of both machines and parts away from the patentee,[25] or the overlapping recovery allowed from the direct and contributory infringers was one of profits rather than damages.[26]
In the Farrand cáse, supra, the payment by the direct infringer was made under judicial decree, and there could thus be no question but that it represented full compensation for the infringing use. Where a private release of past infringement which does not purport to release others is involved, the adequacy of the compensation must always be a question of fact. Hence here, while it seems unlikely that Ford’s payment under the agreement was any less than would have been paid under a license— that is, anything less than full satisfaction to AB for the infringing use committed directly by Ford’s purchasers and contributorily by Aro — we think the case must nevertheless be remanded for findings on the question. We would also allow the lower courts to consider whether Aro’s conduct has been such as to warrant an award of punitive or increased damages, although we think that very unlikely.
V.
The result is that the judgment of the Court of Appeals is reversed insofar as it holds Aro liable for contributory infringement with respect to replacement-fabric sales *646 made after July 21, 1955. The judgment is affirmed insofar as it holds Aro liable with respect to sales made before that date, but subject to the reservation based on the knowledge requirement with respect to sales made before January 2, 1954. The case is remanded to the District Court for further proceedings consistent with this opinion.

It is so ordered.

 The repair-versus-reeonstruction issue had been the only issue expressly considered or decided by the Court of Appeals orr review of the District Court’s original interlocutory judgment, see 270 F. 2d, at 202, and was thus the focal point of the briefs and arguments here in Aro I. See, e. g., Brief for the United States as Amicus Curiae, at 2-3 and n. 1; but see Brief for the Respondent, at 73-76. That the Court considered no other issue, and thus dealt only with the General Motors and not with the Ford cars, is evident from its statement of the "determinative question” as being that of repair versus reconstruction, 365 U. S., at 342; from its failure to *613 consider the body of authority holding that even repair of an infringing article constitutes infringement; and from, among other such statements in its opinion, see id., at 344, 346, its reliance on the proposition that “a license to use a patented combination includes the right” to repair it, id., at 345 — a proposition that of course was not applicable to the Ford cars, whose owners had purchased the patented structures from an unlicensed manufacturer and thus had no “license to use” them. The three other opinions in Aro I were likewise directed entirely to the issue of repair versus reconstruction, and gave no attention to the different considerations that would come into play in the absence of a license from the patentee to the automobile manufacturer. The concurring opinion of Mr. Justice Black, for example, relied on the proposition that “One royalty to one patentee for one sale is enough under our patent law as written,” 365 U. S., at 360, which would seem inapplicable to the situation presented by the Ford cars, where the patentee had not received any royalty on the sale of the patented structures. See also id., at 354, 356, n. 9; and see the dissenting opinion of Mu. Justice HarlaN, 365 U. S., at 369, 373. The concurring opinion of Mr. Justice BrennaN did refer to the presence in the case of *the unlicensed Ford cars; it stated, 365 U. S., at 368, that “the judgment of the Court of Appeals must be reversed, except, however, as to the relief granted respondent [CTR] in respect of the replacements made on Ford cars . . . .” That the author of that opinion did not understand the Court as having ruled differently on the Ford car question, or as having ruled on it at all, is shown by the fact that he concurred generally in the result, rather than concurring in part and dissenting in part. The Court said nothing to indicate disagreement with this interpretation of its opinion and decision.

 We also granted Aro’s motion for leave to use the record that was before us in Aro I. 372 U. S. 958.
CTR has made a Motion to Settle the Record, asking us to declare that certain items designated for printing by Aro do not comprise a portion of the record before this Court. We postponed further *614 consideration of the motion until the hearing of the case on the merits. 375 U. S. 804. The items in question, which were not included in the record in Aro I, consist of certain requests for admissions and answers thereto, and of materials involved in an accounting proceeding begun after the original affirmance by the Court of Appeals but subsequently stayed and never completed. A motion to strike the same materials from the record was made by CTR in the course of the second appeal to the Court of Appeals, and was denied by that court “without prejudice to renewal in its brief, at the oral argument, or upon taxation of costs.” CTR did not renew the motion upon brief or oral argument in the Court of Appeals, but says that it still intends to do so upon taxation of costs if costs should ever be taxed against it by the Court of Appeals. Because of these events in the Court of Appeals, the motion in this Court is also denied, without prejudice to its renewal upon taxation of costs in the Court of Appeals.

 This Part of the opinion — with the exception of the point discussed at p. 488 and note 8, infra — expresses the views of Justices BaklaN, BreNNAN, Stewart, White, and Goldberg.

 The case will be considered in this Part of the opinion without reference to the agreement made on July 21, 1955, between Ford and AB, and thus on the assumption that Ford never obtained any authority under the -patent. The effect of that, agreement will be considered in succeeding Parts of the opinion.

 We have no need to consider whether the car owners, if sued for infringement by the patentee, would be entitled to indemnity from Ford on a breach of warranty theory. In fact they were not sued, and were released from liability by 'the agreement between Ford and AB. See infra, at 493-495.

 The section was designed to “codify in statutory form principles of contributory infringement” which had been “part of our law for *618 about 80 years.” H. R. Rep. No. 1923 on H. R. 7794, 82d Cong., 2d Sess., at 9; see also Congressman Rogers’ statement, Hearings before Subcommittee No. 3 of House Judiciary Committee on H. R. 3760, 82d Cong., 1st Sess., at 159:
“Then in effect this recodification, particularly as to section 231 [which became § 271 in the Patent Code of 1952], would point out to the court, at least that it was the sense of Congress that we remove this question of confusion as to whether contributory infringement existed at all, and state in positive law that there is such a thing as contributory infringement, or at least it be the sense of Congress by the enactment of this law that if you have in the Mercoid case [320 U. S. 661, 680] done away with contributory infringement, then we reinstate it as a matter of substantive law of the United States and that you shall hereafter in a proper case recognize or hold liable one who has contributed to the infringement of a patent.
“That is the substantive law that we would write if we adopted this section 231 as it now exists. Is that not about right?”
Mr. Giles S. Rich, now judge of the Court of Customs and Patent Appeals, then spokesman for proponents of § 271 (c), answered that the statement of the bill’s purpose was “very excellent.” Ibid. See also 98 Cong. Rec. 9323, 82d Cong., 2d Sess., July 4,1952 (colloquy of Senators Saltonstall and McCarran).

 Aro’s factory manager admitted that the fabric replacements in question not only were specially designed for the Ford convertibles but would not, to his knowledge, fit the top-structures of any other cars.

 This view is held by The Chief Justice and Justices Black, Douglas, Clark and White. See the opinion of Mr.- Justice Black, post, pp. 524^528, and of Mr. Justice White, post, p. 514.
Justices Harlan, Brennan, Stewart and Goldberg dissent from this interpretation of the statute. They are of the view that the *621 knowledge Congress meant to require was simply knowledge that the component was especially designed for use in a combination and was not a staple article suitable for substantial other use, and not knowledge that the combination was either patented or infringing. Their reasons may be summarized as follows:
'(1) No other result would have been consistent with the congressional intention to codify the case law of contributory infringement as it existed prior to this Court’s decision in Mercoid Corp. v. Mid-Continent Investment Co., 320 U. S. 661 — and to do this not only in general, see note 6, swpra, and p. 492, infra, but with specific reference to the knowledge requirement. See Hearings, supra, note 6, at 159-160, 163-165. Under that case law, liability was established by a showing that the component was suitable for no substantial use other than in the patented combination, since it was “the duty of the defendant to see to it that such combinations which it is intentionally inducing and promoting shall be confined to those which may be lawfully organized.” Thomson-Houston Elec. Co. v. Ohio Brass Co., supra, 80 F., at 720-723. Accord, Mercoid Corp. v. Mid-Continent Investment Co., supra, 320 U. S., at 664; 3 Walker, Patents (Deller ed. 1937), at 1764-1765, and cases cited. See Freedman v. Friedman, 242 F. 2d 364 (C. A. 4th Cir. 1957).
(2) The House Committee’s change in the language of the bill concerning the knowledge requirement, see the opinion of MR. Justice Black, post, pp. 524r-528, was not intended to limit liability to cases where the alleged contributory infringer had knowledge of the patented or infringing nature of the combination; it was intended merely to assure that the statute would be construed to require knowledge that the article sold was a component of some combination and was especially designed for use therein, rather than simply knowledge that the article was being sold. See, e. g., the statement of Congressman Crumpacker, Hearings, supra, at 175, objecting to the original language on the ground that “the way it is phrased the word 'knowingly’ refers directly to the word ‘sells.’ ” See also id., at 175-176. While the representatives of a manufacturing concefn and of the Justice Department did urge the Committee to adopt the position which the Court now holds it did adopt, none of the Congressmen *622 said anything to indicate agreement with these views or disagreement with the contrary view expressed by the spokesman for the sponsors of the bill. This view, as clearly stated on several occasions at the Hearings, was that
“[Y]ou know that the component is going into that machine. You don’t have to know that it is patented. You don’t have to know the number of the patent, and you don’t have to know that the machine that it is going into constitutes an infringement.” Id., at 175; see also id., at 160, 176.
(3) The suggestion that a person cannot be liable even for direct infringement when he has no knowledge of the patent or the infringement is clearly refuted by the words of § 271 (a), which provides that “whoever without authority makes, uses or sells any patented invention . . . infringes the patent,” with no mention of any knowledge requirement. And the case law codified by § 271 has long recognized the fundamental proposition that “To constitute an infringement of a patent, it is not necessary that the infringer should have known of the existence of the patent at the time he infringed it or, knowing of its existence, it is not necessary that he should have known his doings to constitute an infringement.” 3 Walker, Patents (Deller ed. 1937), § 453. See, e. g., United States v. Berdan Fire-Arms Mfg. Co., 156 U. S. 552, 566; Sontag Chain Stores Co. v. National Nut Co., 310 U. S. 281, 295; Boyden v. Burke, 14 How. 575, 582.
(4) Section 287 of 35 U. S. C., quoted in the opinion of Mr. Justice Black, post, p. 528, n. 14, does not require a different conclusion. That section prevents a patentee from recovering damages for infringement unless he has marked the patented article with notice of the patent. Since a patentee may hardly be expected to mark the article when it has not been manufactured or sold by him, but rather by an infringer, the section has been held not to apply to such a situation. Wine Ry. Appliance Co. v. Enterprise Ry. Equip. Co., 297 U. S. 387. That of course is the situation here with respect to the Ford cars.

 Aro does contend here that recovery by CTR is precluded by misuse of the patent, and also that such misuse entitles Aro to an award of treble damages for violation of the antitrust laws. Although the point was arguably raised by Aro’s original answer and counterclaim, and was decided against Aro in the original opinion of the District Court, 119 U. S. P. Q., at 122, n. 1, it was substantially abandoned on the first appeal, and hence was not ruled on in the first opinion of the Court of Appeals. Accordingly, this Court’s opinion in Aro I stated that patent misuse “is not an issue in this case.” 365 U. S., at 344, n. 10; see also the dissenting opinion of Mr.. Justice Harlan, 365 U. S., at 376-377 and n. 5. On remand, after the District Court had dismissed without prejudice the counterclaim alleging misuse, the Court of Appeals held that neither the defense based on misuse nor the counterclaim was in the case, the defense having been “clearly abandoned” and the counterclaim never having been adequately pleaded. 312 F. 2d, at 58. We do not find error in this ruling, and thus have no occasion to consider Aro’s allegations of patent misuse.

 We have no doubt that § 271 (c) as so construed and applied, within the limitations set forth in the succeeding portions of this opinion, is constitutional.

 This Part of the opinion expresses the views of Justices Brennan, Stewart, White, and Goldberg. Mr. Justice Harlan concurs in the result.

 Counsel for AB testified on deposition as follows:
“I . . . definitely told them that there were these other replacement top manufacturers and that if we were left in a position to collect royalty from them, that obviously we could give Ford a lower rate, and that is what Ford said they wanted, that they weren’t interested in buying any sort of a release or license or anything else that would help out these replacement top people

 The District Court termed the agreement a “future license” in this respect, and AB’s counsel on more than one occasion referred to it as a “release or license.” It is difficult to see why it should not be considered a license insofar as it related to future activity, see De Forest Radio Tel. Co. v. United States, 273 U. S. 236, 241, although of course its proper label is less important than its clear effect of authorizing Ford’s purchasers to make full use of the patented structures.

 In Birdsell the Court relied on the fact that only nominal damages had been awarded in the prior suit. 112 U. S., at 489. In Union Tool the Court’s statement that the patentee had not “received any compensation whatever for the infringement by use of these machines,” 259 U. S., at 113, was apparently based on the fact that the damages and profits awarded by the prior judgment had not yet been calculated or paid. See Brief for Respondent, at 37, and the opinion of the Court of Appeals, 265 F. 669, 673 (C. A. 9th Cir. 1920). Compare Buerk v. Imhaeuser, 4 Fed. Cas. 597 (No. 2,108) (C. C. S. D. N. Y. 1876), 4 Fed. Cas. 594 (No. 2,107) (C. C. S. D. N. Y. 1876).

 The date of the sale by Aro rather than the date of the installation in the car by the purchaser from Aro should control, since it is the act of sale that is made contributory infringement by § 271 (c).

 Since Aro’s infringement thus terminated in 1955, it would seem that the perpetual injunction included in the interlocutory judgment would no longer be a proper element of relief.

 This Part of the opinion, like Part I, expresses the views of Justices Harlan, Brennan, Stewart, White and Goldberg.

 This Part of the opinion expresses the views of Justices Brennan, Stewart, White, and Goldberg. Mr. Justice Harlan considers that the matters here dealt with are not ripe for decision and should be left for determination in the future course of this litigation.

AB’s counsel asserted on deposition: “I believe we would have the right to arrive at royalty and otherwise consider as patented the replacement top . . . .” When asked by the District Court at a hearing concerning a judgment bond how much he expected to recover, CTR’s counsel replied: “I suppose a reasonable royalty would be 5 per cent.” Considerable evidence was introduced .before the Master as to Aro’s income from infringing sales and as to royalty rates fixed in licenses granted by CTR or AB to other replacement-fabric suppliers. See also the statement of AB’s counsel quoted in note 12, swpra, and the statement in CTR’s brief quoted supra, at 496.

 In the 1952 codification, §§ 67 and 70 of the 1946 Code were consolidated in the present § 284. The stated purpose was merely “reorganization in language to clarify the statement of the statutes.” H. R. Rep. No. 1923, 82d Cong., 2d Sess., at 10, 29.

 See also Hearing before the House Committee on Patents, 79th Cong., 2d Sess., on H. R. 5231 (subsequently amended, reintroduced, and reported as H. R. 5311), Jan. 29, 1946, e. g., pp. 2-3.

 No answer was given by AB’s counsel to the question how the $73;000 figure had been arrived at, except to say that it would have been larger if it had been intended to release contributory infringers as well. But the fact that paragraph 3 of the agreement provides for a 5% royalty on replacement tops, as the General Motors license agreement also apparently did, suggests that the effective royalty received from Ford for the right to make and sell the patented top-structures was the same as that received from General Motors.

 See also Thomson-Houston Elec. Co. v. Ohio Brass Co., supra, 80 F. 712, 721; Rep. Atty. Gen. Nat. Comm, to Study the Antitrust laws, supra, at 252; Rich, 21 Geo. Wash. L. Rev. 521, 542 (1953); Eastman, 48 Mich. L. Rev. 183, 187 (1949); Note, 66 Yale L. J. 132 (1956).

 Reed Roller Bit Co. v. Hughes Tool Co., 12 F. 2d 207, 209, 210 (C. A. 5th Cir. 1926).

 National Brake & Elec. Co. v. Christensen, 38 F. 2d 721 (C. A. 7th Cir. 1930); Graham v. Mason, 10 Fed. Cas. 930 (No. 5,672) (C. C. D. Mass. 1872).

 E. g., Conmar Products Corp. v. Tibony, 63 F. Supp. 372, 374 (D. C. E. D. N. Y. 1945).